**IN THE UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

| | |
|---|---|
| THE ONLY ONE, INC., *et al.* | * |
| | * |
| PLAINTIFFS, | * MDL Docket No. 2557 |
| | * |
| v. | * Case No. 6:14-cv-06009-GAP-TBS |
| | * |
| STATE FARM MUTUAL AUTOMOBILE | * Originally filed in N.D. Ala. |
| INSURANCE COMPANY, *et al.*, | * |
| | * |
| DEFENDANTS. | * |

_____/

**CERTAIN DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Certain Defendants[1] move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs'

First Amended Complaint ("FAC") with prejudice.

**MEMORANDUM OF LAW**

**I.      INTRODUCTION**

The antitrust claims in Plaintiffs' FAC are substantively identical to the antitrust

claims in the Florida second amended complaint that the Court recently dismissed with

prejudice,  (*A&E Auto Body, Inc.*, No. 6:14-cv-00310, Doc. 341.) Plaintiffs' claims should be

dismissed for the same reasons and under the same analysis.   The FAC adds mostly

immaterial filler to allegations that this Court already ruled are insufficient to allege an

antitrust conspiracy. It offers nothing in the way of relevant new substantive allegations

sufficient to salvage the pleading or state plausible claims for price-fixing conspiracy or

---

[1] The Defendants joining this motion are Allstate Indemnity Company, Allstate Insurance Company, Allstate Northbrook Indemnity Company, Allstate Property and Casualty Insurance Company, Esurance Insurance Company, Esurance Property and Casualty Insurance Company, State Farm Mutual Automobile Insurance Company, and State Farm Fire and Casualty Company.

boycott. As in their prior complaint, Plaintiffs do not allege the existence of any express agreement among Defendants.  Instead, the FAC (i) continues to rely on allegations of unilateral conduct and conscious parallelism that cannot give rise to claims under Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) fails to correct the legal deficiencies identified by this Court in its Order of Dismissal in this case (Doc. 32, *adopted* Doc. 40) and in its Orders of Dismissal in the companion *A&E* case (*see A&E*, Docs. 293 & 341); and (iii) continues Plaintiffs' pattern of impermissible group pleading.  The key features of the allegations that are new in the FAC (but which in substance are almost entirely repetitive of allegations made in the recently dismissed *A&E* second amended complaint) are summarized below:

- The FAC continues to rely on entirely conclusory allegations that all Defendants purportedly chose to pay Plaintiffs the same labor and material rates previously set by State Farm and not to increase the rates that they paid Plaintiffs between 2009 and late 2014. Those allegations underscore State Farm's unilateral conduct followed by some parallel reimbursement conduct on the part of some Defendants in some periods of time.

- Although the FAC purports to allege certain "plus factors," such as opportunities to conspire and profit seeking, these allegations are substantively indistinguishable from the same conclusory allegations previously rejected by the Court.  Plaintiffs' quixotic theory that some Defendants have relationships with the investment and asset management firm BlackRock lacks any factual or logical connection to a conspiracy claim.

- To support their group boycott claim, Plaintiffs have added a handful of allegations of purported incidents of "steering" over the past 10 years by a few of the 50 Defendants.  Plaintiffs assert that these allegations of steering by a handful of Defendants somehow support their sweeping claim that all Defendants have agreed to engage in an unlawful boycott against all Plaintiffs.  That is an illogical and implausible inference.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  There are no factual allegations to support the claim that all Defendants colluded to refuse to deal with Plaintiff shops.  The FAC fails even to allege conduct that could fairly be described as parallel.  Moreover, the FAC does not state a boycott claim for the same fundamental reason that the previous iterations fell short – vaguely asserted isolated examples of purported steering by individual insurers are not equivalent to a *concerted* refusal to deal.  Indeed, the allegations make clear that these Plaintiffs continue to do business

with the various Defendants, so there has clearly been no "boycott" at all.

- As plaintiffs in many of the other actions in this MDL have done in amending their complaints, Plaintiffs have larded the FAC with apparent new claims that Defendants have conspired to fix the prices of replacement parts and to require shops to use aftermarket, salvaged, or recycled parts.  Plaintiffs do not tie any of these allegations to any agreement among Defendants regarding reimbursement rates or otherwise; they fail even to allege parallel conduct. Individual insurers acting in their own self-interest to reduce the cost of automobile repairs is hardly evidence of any anti-competitive conspiracy.  It is precisely the kind of profit-maximizing conduct that one would expect in a competitive marketplace.  *A&E*, Doc. 341 at 9.  These allegations also employ the same collective pleading technique that the Court has previously rejected.  (*See A&E*, Doc. 110 ¶ 4; *A&E*, Doc. 293 at 6 & n.8.)

The analysis and observations set out in the Court's recent opinion in *A&E Auto Body* are fully applicable and readily adaptable to Plaintiffs' FAC.  After nearly a year of trying, Plaintiffs continue to fall far short of "nudg[ing]" their claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  It is clear now that, no matter how many tries they get and no matter how many pages of allegations they draft, Plaintiffs cannot state a claim against Defendants.  Plaintiffs' claims therefore should, like the claims in *A&E Auto Body*, be dismissed with prejudice.

## II.    PLAINTIFFS' ANTITRUST CLAIMS (COUNTS ONE AND TWO) SHOULD BE DISMISSED.[2]

### A.    Plaintiffs' New Conspiracy Allegations Fail to Overcome the Shortcomings of Their Original Complaint.

To survive a motion to dismiss, a plaintiff alleging an antitrust conspiracy must adequately plead that the defendants "(1) entered into 'a contract, combination or conspiracy,' which was (2) 'in restraint of trade or commerce' and (3) that [the plaintiff] was damaged by the violation."  *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1300

---

[2] Defendants hereby adopt and incorporate the legal standards for a Rule 12(b)(6) motion set out in the Court's June 3, 2015 Report and Recommendation (Doc. 32 at 4-5, *adopted* Doc. 40).

(M.D. Fla. 2001) (citation omitted).  Plaintiffs still fail to satisfy the first prong of this test because they have not alleged a plausible conspiracy among all or any Defendants.

The FAC must, but does not, contain "'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557), and must, but does not, offer "'enough factual matter (taken as true) to suggest that an agreement was made.'" *A&E*, Doc. 293 at 17 (quoting *Twombly*, 550 U.S. at 556).  Allegations "that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy' are insufficient." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554).   "'[F]ormulaic recitations' of a conspiracy claim" are insufficient, and "'a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'"  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557).

1.    **The FAC's Allegations of Conscious Parallelism Do Not Suggest a Conspiracy to Fix Reimbursement Rates.**

Plaintiffs allege that Defendants imposed maximum labor rates for automobile repair services.  The "crucial question," however, remains "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553 (citation omitted); *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298-99 (11th Cir. 2003) ("[I]t is important to distinguish at the outset between collusive price fixing, i.e., a 'meeting of the minds' to collusively control prices, which is prohibited under the Sherman and Clayton Acts, and 'conscious parallelism,' which is not.").

4

Like its predecessor, and the nearly-identical Florida second amended complaint, the FAC fails to meet the standards set by the Supreme Court and the Eleventh Circuit for pleading an antitrust conspiracy.  The rate-fixing conspiracy alleged in the prior complaint was based entirely on Plaintiffs' general characterization of Defendants' conduct as conscious parallelism, without so much as a single factual allegation that there were parallel rate reimbursement levels set by any Defendants.  The FAC adds some allegations of episodic instances in which some, but not all, Defendants stated that they would not increase the rates they paid until State Farm first altered its market rate.  This Court has already explained, however, that such parallel conduct neither "itself constitut[es] a Sherman Act offense" nor is itself sufficient to plausibly plead the existence of an agreement.  *A&E*, Doc. 293 at 16.  In dismissing the antitrust conspiracy claims in the *A&E* case, this Court noted that, "aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when."  *Id.* at 17; *see also A&E*, Doc. 341 at 6-8.

Plaintiffs have not cured these defects.  The FAC still contains no allegation that Defendants entered into any agreement to fix prices or to boycott suppliers, and no contextual allegations to suggest the existence of such an agreement.  Plaintiffs still do not offer any factual allegations to support the conclusion that there was a conspiracy among the Defendants.  There are no allegations as to who reached an agreement with whom, what that agreement entailed, or when it began or ended.  Their allegation that the supposed parallel conduct has been going on for at least 10 to 15 years (FAC ¶¶ 141, 348) merely underscores the implausibility of their conspiracy theory.  None of the newly added allegations in the

FAC, separately or in context, raise a suggestion of a preceding agreement among Defendants to fix reimbursement rates. There is no factual context to suggest that Defendants agreed with State Farm or among themselves to adopt State Farm's rate reimbursement levels. Indeed, there are literally no allegations of any conduct whatsoever on the part of many Defendants. Plaintiffs' core allegation remains the self-defeating generalization that after State Farm, the alleged market leader, unilaterally developed and adopted a price structure for labor rates, other Defendants at some point thereafter individually refused to pay any more than State Farm.

Plaintiffs do not allege sufficient factual matter to place this conduct in a "context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Thus, there are no factual allegations supporting an inference that the parallel reimbursement rates resulted from a preceding agreement among the Defendants. Because conclusory allegations and recitals of the elements of a cause of action are not presumed true at the pleading stage, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), Plaintiffs have not, and plainly cannot, set forth factual allegations plausibly establishing an antitrust conspiracy.

Plaintiffs' allegations of supposed parallel business conduct are also conclusory and insufficient group pleading. For instance, they claim that State Farm determined that the market rate in Alabama was $48 per hour between "at least" 2009 and late 2014, (FAC ¶¶ 214, 248,) but they merely allege that all Defendants also paid $48. They offer no explanation for how or why any Defendant's decision not to agree to increase its rates is suggestive of conspiracy rather than lawful parallel business conduct. (*See id.* ¶¶ 216-49.)

Plaintiffs surmise from these conclusory allegations that the rates paid by State Farm "could only have been provided by State Farm to its ostensible competitors." (FAC ¶ 251.) Plaintiffs do not allege when, how, by what means, or to whom State Farm provided such information to the other Defendants or that other Defendants agreed to use the same rates, nor do they allege that any Defendants possessed this information before State Farm set its market rate at $48.

State Farm is alleged to be the market leader (FAC ¶ 90) and to unilaterally set the prices it will pay for repairs based on its regularly conducted survey (*see id.* ¶¶ 191-201, 214).  Merely following a price leader is common within different industries and does not suggest the existence of an agreement.  *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910 (6th Cir. 2009) (explaining that, "'as will often be the case, the leader's price increase is likely to be followed'" and concluding that "each defendant's decision to match a new commission cut was arguably a reasoned, prudent business decision" (citation omitted)); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act"); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1200 (7th Cir. 1981) (conspiracy not inferable from Defendants' "adherence to a 'common formula' for calculating damage estimates" for automobile repairs).

Plaintiffs focus many allegations on State Farm's surveys, but they do not allege that State Farm's surveys involved anything other than State Farm's unilateral conduct or that any Defendant implemented a price change before State Farm changed the rates it paid body

shops in response to its survey results.  (*See, e.g.*, FAC ¶ 216.)  In fact, Plaintiffs allege that State Farm acted to protect the confidentiality of its surveys (*id.* ¶¶ 207-11), not that it used the surveys to communicate with other Defendants about rates.  In any event, the other Defendants did not need to know State Farm's survey methodology or to conduct their own surveys to know what State Farm and other insurers actually paid body shops.

As in *Twombly*, there are obvious explanations for why rational and self-interested insurers would know the rates paid by their competitors.  Plaintiffs allege that Defendants engage with Plaintiffs and with other body shops in hundreds of transactions every day in the ordinary course of business.  The rates body shops are paid are an integral part of these transactions.  Body shops doing business with State Farm across Alabama, including Plaintiffs, all would learn in the ordinary course of business what rates State Farm was willing to pay them, just as they would know the rates paid by other insurers with whom they do business.  Moreover, these rates allegedly are static for years at a time.  (FAC ¶¶ 214, 248.)  Thus, it is both obvious and entirely reasonable that the rates State Farm paid were well known among both body shops and the insurers with whom they regularly transact.  *See A&E*, Doc. 341, at 10 ("Given that this information would be possessed by every automobile repair shop in the state, it seems unlikely the Defendants could keep it secret even if they wished to do so."); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010) ("The details of commission agreements with other insurers, for example, could be a powerful tool for a broker attempting to negotiate a more favorable agreement with a particular insurer-partner.").  That alleged knowledge does not suggest a conspiracy.

Plaintiffs' rhetorical contention that the data "could only have been provided by State Farm to its ostensible competitors," (FAC ¶ 251,) is a mere conclusion, with a demonstrably faulty premise.  Shops would have been told the rates resulting from the State Farm survey, if not the methodology, when State Farm told them what rates it was willing to pay.  (*See, e.g.*, *id.* ¶¶ 214, 248.)  Plaintiffs' allegations also suggest that insurers would learn competitive pricing information in the implementation of DRP agreements, which purportedly require pricing concessions or most favored nations provisions that oblige shops to charge no more than what other insurers pay for the same services.  (*Id.* ¶¶ 142, 149.)

Moreover, "'the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition.'"  *Quality Auto,* 660 F.2d at 1205 (citation omitted); *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("Gathering competitors' price information can be consistent with independent competitor behavior."); *In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) ("There are many legal ways in which Cargill could have obtained pricing information on competitors."); *cf. In re Travel Agent*, 583 F.3d at 907 (refusing to infer conspiracy where Defendants were not alleged to have received information about rate reductions before they were implemented).

In short, Plaintiffs' factual allegations of quasi-parallel conduct permit no inference other than that it was in the rational, independent business interests of Defendants to demand lower prices and to refuse to pay more than their competitors were being charged.  *See Twombly*, 550 U.S. at 554 (allegations that are "consistent with conspiracy, but just as much

in line with . . . rational and competitive business strategy" do not suffice).  In dismissing the

Complaint, this Court adopted its analysis of the factually indistinguishable allegations in the

*A&E* case, where it ruled that Plaintiffs' allegations of purported statements by insurers that

they would pay no more than State Farm did not give rise to an inference of a prior

agreement:

> It is not illegal for a party to decide it is unwilling to pay a higher hourly rate
> than its competitors have to pay, and the fact that a number of the Defendants
> made statements to that effect does not tip the scales toward illegality. . . .
> Without more, statements such as these suggest that the party is acting out of its
> own economic self-interest rather than because of an agreement to fix prices, as
> required to violate § 1. . . .  Plaintiffs themselves suggest that the Defendants
> might have been acting in response to perfectly lawful motivations.

*A&E*, Doc. 293 at 18; *see also A&E*, Doc. 341 at 8 ("This argument fails for the obvious

reason that paying as little as possible for repairs is clearly in the self-interest of automobile

insurers, as it improves their bottom lines.").  Plaintiffs have not provided any new

allegations in the FAC that would alter this conclusion in the present case.[3]

### 2. The FAC Does Not Allege Any Factual Plus Factor Supporting a Plausible Inference of Conspiracy.

The FAC provides no details regarding the supposed agreement or any "specific time,

place, or person involved in the alleged conspiracies."  *See Twombly*, 550 U.S. at 565 n.10.

---

[3] Plaintiffs now allege that an unidentified "agent" of State Farm stated that "'every iota'" of the Louisiana
Attorney General's action against State Farm "'is the truth . . . . when you read [the complaint], it's like, that
"that's us."'"  (FAC ¶ 236.)  This purported recitation of an unidentified agent's personal opinion is too vague
to provide any indication of which allegations this unspecified agent supposedly thinks are accurate or why the
employee should be supposed to have any knowledge of the truth or falsity of any particular allegations.
Moreover, the action brought by the Attorney General of Louisiana is replete with even vaguer and more
conclusory allegations than those in the FAC and focuses on unilateral conduct by State Farm. The Attorney
General's Petition asserts only unfair trade practices and an intra-corporate conspiracy among State Farm
entities (which is not a cognizable conspiracy under federal antitrust law, *see Copperweld Corp. v.
Independence Tube Corp.*, 467 U.S. 752 (1984)), not a conspiracy between State Farm and any outside
insurance companies.  This supposed admission thus gets Plaintiffs no closer to satisfying their pleading
obligations than they were before.

Plaintiffs also do not offer any "plus factors" that might make it plausible to infer a conspiracy from the alleged parallel conduct. *See id.* at 556 n.4 (discussing examples of plus factor allegations that might suffice to plead conspiracy); *Williamson Oil Co.*, 346 F.3d at 1301 ("[P]rice fixing plaintiffs must demonstrate the existence of 'plus factors' that remove their evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism."). Plaintiffs simply recycle, at somewhat greater length, the conclusory allegations this Court previously rejected.

a.   Opportunities to Conspire (FAC ¶¶ 434-59)

In support of their theory that 50 different insurers conspired to fix the prices they would agree to pay for auto repairs throughout Alabama, Plaintiffs point to some Defendants' membership in various trade associations and standard-setting organizations. (*See* FAC ¶¶ 435-59.) Unspecified meetings of these associations, Plaintiffs speculate, could have served as opportunities for high-level executives and officers of some Defendants to get together and form a conspiracy. (*See id.* ¶¶ 441-42, 448-49, 454, 459.)

Contrary to Plaintiffs' claims, and as this Court has already held, mere opportunities to conspire at trade association meetings do not plausibly suggest an agreement, particularly where the Defendants had an independent, rational reason to be at the alleged meeting place. *See Am. Dental Ass'n*, 605 F.3d at 1295 ("participation in trade organizations provides no indication of conspiracy"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349 (affirming dismissal where "neither defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *In re Travel Agent*, 583 F.3d at 911 ("[A] mere opportunity to conspire does not, standing alone, plausibly

102423671.1

suggest an illegal agreement because [Defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior."). As this Court has explained, the fact that "State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement." *A&E*, Doc. 293 at 17 n.11. Indeed, "[e]ven if all of the Defendants had been members of one such organization, it would not aid the Plaintiffs' efforts to state a claim, because participation in trade organizations 'provides no indication of conspiracy.'" *A&E*, Doc. 341 at 10 (citation omitted).

Moreover, Plaintiffs have not alleged facts that could have created an opportunity to conspire in the first place. They do not list or describe a single meeting of any of these associations, who attended, when it occurred, what contacts or communications occurred, or how any of these unspecified contacts or communications might be substantively, temporally, or causally related to any of the purported parallel conduct that Plaintiffs allege. *See In re Travel Agent*, 583 F.3d at 910 (affirming dismissal where complaints did "not cite any specific meetings that involved both [Defendants]").[4]

b.    Common Motive to Conspire (FAC ¶¶ 460-88)

As before, the only motive Plaintiffs offer for the alleged price-fixing conspiracy is that it would be profitable for Defendants to pay less for repairs. (*See* FAC ¶ 461.) A profit motive is not sufficient to articulate a common motive to conspire. *See, e.g.*, *White v. R.M.*

---

[4] The FAC includes a throwaway allegation that an unidentified "Progressive representative" in Pennsylvania speculated that unidentified insurance companies "get together to determine rates" and that "new rates" "probably" would be determined at a then-future meeting in April 2015. (FAC ¶ 233.) This employee's speculation falls far short of supporting the plausibility of the multi-year and multi-faceted conspiracy claim Plaintiffs attempt to allege. Nor does the FAC allege that the supposed meeting ever occurred, which insurers attended, or any details about what was discussed.

*Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("Taking as a given that all of the defendants had motive to conspire with one another to earn high profits, all such a motive shows is that the defendants could reasonably expect to earn higher profits by keeping prices at a supracompetitive level through parallel pricing practices.").

As this Court noted in dismissing the Complaint, the parallel pricing conduct alleged by Plaintiffs is in the independent, profit-maximizing self-interest of each Defendant insurer, which renders Plaintiffs' conspiracy claim implausible.  *See A&E*, Doc. 293 at 18; *A&E*, Doc. 341 at 9; *see also Jacobs*, 626 F.3d at 1342 ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors—assuming they are rational actors acting in their economic self-interest—would enter into an illegal price-fixing agreement (with the attendant costs of defending against the resulting investigation) to reach the same result realized by purely rational profit-maximizing behavior.").

In the FAC, Plaintiffs have attempted to piece together a tenuous theory that some Defendants were somehow incentivized to conspire because they have relationships with BlackRock. (FAC ¶¶ 470-87.) Specifically, Plaintiffs allege that six of the Defendants invest "in or through" BlackRock, an asset management firm that manages over $4.32 trillion.  (*Id.* ¶ 472.)   Plaintiffs claim, among other things, that BlackRock owns shares of a paint manufacturer, PPG Industries, and a supplier of recycled parts, LKQ Corporation.  (*Id.* ¶¶ 473, 481.)   Plaintiffs claim that all Defendants therefore somehow share a motive to conspire, for reasons that are unclear, through profits and discounts involving PPG and LKQ. (*Id.*  ¶¶  477-78, 485-87.) Plaintiffs' contrived theory includes no allegation of how Defendants coordinated or could have coordinated their collision repair decisions through

BlackRock, no allegation that they had any say in BlackRock's investment decisions, and no allegation that BlackRock is anything other than a passive investor.  Moreover, Plaintiffs do not allege that any Defendants have required that a specific type of paint be used, let alone PPG's paint, or that all Defendants require that LKQ's recycled parts must be used for repairs.

c.     <u>Action Against Self-Interest (FAC ¶¶ 491-95)</u>

The FAC adds no coherent allegations that would show why, absent an agreement, it would be irrational for an insurer to ask body shops to lower their labor rates to the levels they charge a different insurer.  *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers" and "that is the sort of conduct that the antitrust laws seek to encourage").  To the contrary, as this Court noted, Plaintiffs' "argument fails for the obvious reason that paying as little as possible for repairs is clearly in the self-interest of automobile insurers, as it improves their bottom lines." *A&E*, Doc. 341 at 8.  Defendants set the amounts they will pay to reimburse for repairs regardless of which body shop their policyholders choose, and Plaintiffs concede that even when a shop wants to charge higher rates, Defendants simply refuse to reimburse for the higher charges.  (*See, e.g.*, FAC ¶¶ 107, 115, 123, 133-36, 160, 162, 186, 243-44.)  Plaintiffs offer nothing to suggest that the ability or decision of a Defendant to refuse to pay these higher prices depended on the actions of other insurers. In addition, as this Court noted, Plaintiffs' theory that Defendants needed to act in concert to avoid eventually losing

102423671.1

customers through negative publicity, (*see id.* ¶¶ 493-94,) is speculation not entitled to further attention.  *See A&E*, Doc. 341, at 8.

### 3.   Plaintiffs' New Allegations Regarding Prices of Replacement Parts, Types of Parts Used, and Reimbursement Policies for Various Repair Procedures Do Not Set Forth a Price-Fixing Claim.

Plaintiffs have added or expanded a number of allegations concerning Defendants' payments for replacement parts (as distinguished from body labor or paint and materials rates), certain repair processes and procedures, and requirements for use of allegedly "substandard or dangerous" replacement parts.  (FAC ¶¶ 81, 261, 342.)[5]  The FAC does not tie any of these allegations to any agreement by Defendants regarding repair or parts reimbursement rates or policies.  There are no non-conclusory allegations of parallel conduct with respect to parts or procedures to support a conspiracy claim in the first place.

To the contrary, these new allegations only underscore differences among the alleged reimbursement practices and parts replacement decisions of Defendants, rendering any alleged conspiracy or agreement implausible.  With respect to the type of replacement parts, some Defendants write estimates specifying the use of "aftermarket" (non-OEM) parts.  (FAC ¶ 112.)  Other Defendants allegedly specify salvage parts.  (*Id.*)  Yet other Defendants are "exceptions."  (*Id.*)  With respect to parts procurement, some Defendants require parts to be ordered through the Parts Trader electronic marketplace.  (*Id.* ¶ 113.)  Other Defendants order the parts themselves and ship them to the body shop.  (*Id.* ¶ 117.)  Still others tell the body shop which part to order from which vendor.  (*Id.*)  With respect to reimbursement

---

[5] The FAC is also replete with a catalog of other body shop grievances concerning matters having no apparent logical relationship to Plaintiffs' claims.  Examples include DRP indemnity agreements (FAC ¶ 144), and disclosures of aftermarket parts (*id.* ¶¶ 329-39).  These irrelevant allegations of various supposed practices by different insurers also are inconsistent with any notion of parallel conduct by Defendants.

practices, Plaintiffs allege that Defendants base their estimates on different estimating software programs or independent appraisers.  (*Id.* ¶ 270.)  Defendants' decisions to reimburse for certain procedures also are based on different methods and appear to vary depending on the circumstances.  (*See, e.g.*, *id.* ¶¶ 275-78, 288-94.)  Such pervasive variations hardly support even the FAC's general allegations of parallel conduct, much less give rise to a plausible inference of conspiracy or agreement.  *See In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (affirming dismissal of claim that Defendants conspired to fix the various terms of elevator repair parts and services for failure to show any parallel conduct in the first place).

Plaintiffs' suggestion that their allegations entitle them to discovery that will enable them to repair the deficiencies in their claim (*e.g.*, FAC ¶¶ 259, 296, 307) is wholly unwarranted.  In the absence of "allegations that reach the level suggesting conspiracy" and of any "reasonably founded hope that the [discovery] process will reveal relevant evidence to support a § 1 claim," allowing this case to proceed to enormously expensive antitrust discovery would contravene the dictates of *Twombly*.  550 U.S. at 559-60 (citations omitted).  Indeed, given Plaintiffs' "repeated failure to cure deficiencies by amendments previously allowed," *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003), Plaintiffs' antitrust conspiracy claims should be dismissed with prejudice as a matter of law.

**B.     The FAC's Boycott Allegations Are Insufficient As a Matter of Law.**

Count Two should be dismissed for the independent reason that Defendants' alleged conduct does not constitute a group boycott as a matter of law.  A group boycott under the antitrust laws requires proof of a "*concerted refusal*" to deal.  *Quality Auto Body*, 660 F.2d at

102423671.1

1206 (emphasis added); *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 577 (5th Cir. 1982). The conduct Plaintiffs allege in apparent support of their boycott claim includes a smattering of allegations that a few Defendants attempted to steer policyholders to non-plaintiff shops or told certain of their policyholders not to take their cars to certain body shops. There are no such new allegations of attempted steering as to 37 of the 50 Defendants.  Moreover, even the few allegations of purported steering are highly specific and individualized.  The addition of some isolated facts as to a few Defendants shines a spotlight on the truth that Plaintiffs have no basis for their broad allegations of a *concerted* refusal to deal.

The FAC offers no facts to support the claim that 50 different insurers agreed to refuse to deal with Plaintiffs in hundreds or thousands of transactions, much less any detail about when, how, or with whom agreements were or could have been made.  Their only "evidence" to support the existence of such an agreement – that a few Defendants allegedly steered business away from a few Plaintiffs in the months or years after those Plaintiffs dissociated from other insurers' direct repair programs and therefore must have engaged in the steering to punish the shops – is a speculative interpretation of clearly insufficient allegations conduct that cannot even reasonably be characterized as parallel.  *See A&E*, Doc. 293 at 21 ("Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an agreement to fix prices.").[6]

---

[6] As Plaintiffs themselves allege, DRP membership results in a shop being listed as a preferred provider and receiving referrals from the sponsoring insurer. (FAC ¶¶ 137, 142.)  It is not surprising, therefore, that a shop's revenue would decline after leaving an insurer's direct repair program.

In addition, steering is not equivalent to a refusal to deal and, accordingly, cannot support a boycott claim.[7]   Allegations that Plaintiffs' revenue from certain Defendants declined since they disassociated from direct repair programs (FAC ¶¶ 409-15) contradict the notion that even individual Defendants refused to deal with Plaintiffs.

As this Court previously concluded in dismissing the *A&E* action with prejudice, Plaintiffs' additional allegations of a few instances of alleged steering still "fails to state a boycott claim.   Even accepting the allegations as true, they in no way suggest that the Defendants have engaged in a concerted refusal to deal.   Each of the incidents involves a single Defendant discouraging one of its insureds from dealing with a single Plaintiff (or misleading the insured into refusing to do so); there are no allegations that at the time any of these steering incidents occurred, the other Defendants (or any of them) were also preventing their insureds from utilizing that particular Plaintiff's services.   Just as important, the Plaintiffs never allege that any of these incidents had anything to do with price-fixing, as they do not allege that, at the time the steering occurred, the shop at issue was demanding higher rates or otherwise challenging the price-fixing scheme." *A&E*, Doc. 341 at 12-13 (emphasis omitted).   The same conclusion should be reached here.

---

[7] *See also Quality Auto Body*, 660 F.2d at 1206 (even if two insurers agreed to refuse to pay more than competitive price for automobile repairs, that agreement did not constitute a boycott); *Custom Auto Body, Inc. v. Aetna Cas. & Sur. Co.*, 1983 WL 1873, at *19 (D.R.I. Aug. 3, 1983) (body shop "at all times has been free to compete for the business of the defendant and its insureds by offering lower prices or higher quality services"); *Nationwide Mut. Ins. Co. v. Auto. Serv. Councils of Del., Inc.*, 1981 WL 2053, at *2-4 (D. Del. Apr. 10, 1981) (discouraging insureds from using body shops "by telling them that their prices were too high, and by notifying the owners that Nationwide would not guarantee full reimbursement" did not constitute refusal to deal; there was "no suggestion of an outright refusal of Nationwide to deal with any repair shop," rather Nationwide had "simply refused to accede to what it considers to be defendants' excessive prices").   Plaintiffs cannot cure the deficiencies of their boycott claim by invoking the word "coerce."   (FAC ¶ 549.)   None of the alleged conduct comes close to coercion.   *See Nationwide Mut.*, 1981 WL 2053, at *3 ("driving a hard bargain . . . hardly constitutes a form of 'coercion' cognizable under the antitrust laws").

## V.      CONCLUSION

As this Court ruled in *A&E*, it is apparent at this stage of the litigation, after Plaintiffs' multiple attempts to amend in this case and the other consolidated MDL cases, that any further amendment of Plaintiffs' FAC would be futile.  The Court should dismiss all of Plaintiffs' claims against Defendants with prejudice.  *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005); *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1264 (11th Cir. 1998) (affirming dismissal with prejudice).

Dated:  October 9, 2015                    Respectfully submitted,

/s/ Johanna W. Clark
Johanna W. Clark
CARLTON FIELDS JORDEN BURT, P.A.
450 S. Orange Ave., Suite 500
Orlando, Florida 32801
Telephone: (407) 849-0300
Facsimile: (407) 648-9099
Email: jclark@cfjblaw.com

Michael L. McCluggage
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
E-mail: mmcluggage@eimerstahl.com

Michael P. Kenny
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: 404-881-7000
Facsimile: 404-881-7777
Email: mike.kenny@alston.com
*Attorneys for Defendants State Farm Mutual*
*Automobile Insurance Company and State*
*Farm Fire and Casualty Company*

*/s/ Richard L. Fenton*
Richard L. Fenton (admitted pro hac vice)
Mark L. Hanover (admitted pro hac vice)
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel: (312) 876-8000
Fax: (312) 876-7934
Email: richard.fenton@dentons.com
Email: mark.hanover@dentons.com

Bonnie Lau
Dentons US LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
Telephone: (415) 882-5000
Facsimile: (415) 882-0300
bonnie.lau@dentons.com

Lori J. Caldwell (Florida Bar No. 026874)
Rumberger, Kirk & Caldwell, PA
300 S Orange Ave, Suite 1400
PO Box 1873
Orlando, FL 32802-1873
Tel: (407) 839-4511
Fax: (407) 835-2011
Email: lcaldwell@rumberger.com

*Attorneys for Defendants Allstate Indemnity
Company, Allstate Insurance Company,
Allstate Northbrook Indemnity Company,
Allstate Property and Casualty Insurance
Company, Esurance Insurance Company,
and Esurance Property and Casualty
Insurance Company*

20

## **CERTIFICATE OF SERVICE**

I certify that on October 9, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record and other participants in the Court's ECF filing system. I further certify that I will mail a true and correct copy of the foregoing document to any non-ECF participant as identified by the ECF notification system.

/s/ *Johanna W. Clark*
Johanna W. Clark

102423671.1